Filed 10/20/25  Marriage of More CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of KEITH P. and ROBIN MORE. | |
| KEITH P. MORE, Appellant, v. ROBIN MORE, Respondent. | G063945 (Super. Ct. No. 15D004087) ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on September 18, 2025, be modified as follows:

1.    On page 18, footnote 9, delete the last sentence and replace with new sentence in its place: Regardless of what we label this threshold requirement, however, we have considered all of Keith's arguments as to whether Robin showed a change of circumstances.

This modification does not change the judgment.

The petition for rehearing is DENIED.



MOORE, ACTING P. J.

WE CONCUR:


GOODING, J.


BANCROFT, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of KEITH and ROBIN MORE. | |
| KEITH MORE, Appellant, v. ROBIN MORE, Respondent. | G063945 (Super. Ct. No. 15D004087) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Lee L. Gabriel, Judge. Affirmed.

Law Offices of Marjorie G. Fuller and Marjorie G. Fuller; Law Offices of Lisa R. McCall and Lisa R. McCall for Appellant.

Attorney at Law Stephen Temko for Respondent.

\*          \*          \*

Keith and Robin More are both licensed attorneys that were married for nearly 25 years before separating.[1] During their marriage, Keith ran a successful law firm. Robin worked as an attorney for a few years but eventually left her job to focus on raising the parties' children. One child was still a minor when the parties separated in 2014. Keith and Robin eventually agreed to a stipulated judgment (the judgment) that was negotiated in 2017 and entered in April 2018. The judgment awarded each party around $5.2 million in assets and required Keith to pay Robin monthly spousal support of $19,000 and child support of $5,000.

In June 2020, Robin sought modification of both support orders (the modification request). The family court granted her request in 2024. It increased spousal support to $62,000 per month from June 2020 to July 2023. But it found that Robin had failed to comply with a *Gavron* warning largely due to her refusal to find work as an attorney.[2] Thus, the court imputed $10,000 in income to her starting July 1, 2023, decreasing spousal support to $52,000 from that date forward. The court also ordered Keith to pay over $170,000 in retroactive child support for the period from June 2020 through June 2021, when child support terminated. On appeal, Keith makes various challenges to the family court's support orders. We find no error.

The court had authority to modify spousal support due to the confluence of two factors. First, the initial award of $19,000 per month was insufficient to meet Robin's needs. The record indicates she needed $70,000 to

_____

[1] We refer to the parties by their first names for clarity.

[2] "[A] '*Gavron* warning' is a fair warning to the supported spouse he or she is expected to become self-supporting." (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 55.) It originates from *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705. (*Ibid.*)

$75,000 in pretax income to maintain the marital standard of living, which was calculated using the parties' income from the last five years of their marriage. However, when the parties negotiated the stipulated judgment in 2017, Keith's income had decreased to about $80,000 per month. This sum was tens of thousands of dollars below his average monthly income over the marriage's last five years. The record indicates Robin agreed to spousal support well below the marital standard of living due to Keith's decreased income after separation. This leads to the second factor: Keith's income rose dramatically after 2017. In 2018, he averaged $866,488 per month. Thus, the court modified spousal support because the initial award of $19,000 was insufficient, and Keith's increased income enabled him to pay Robin the sum she needed to maintain the marital standard of living.

Nor did the family court abuse its discretion by increasing spousal support despite Robin's failure to comply with the *Gavron* warning. The record shows that even if Robin returned to practicing law and spousal support were kept at $19,000 per month, her total income (including investments) would be about $30,000 short of meeting her monthly needs of $70,000 to $75,000. Due to the marriage's length and the wide gap between Robin's potential income and her needs, it was not unreasonable for the court to increase spousal support but impute $10,000 of monthly income to Robin to address the *Gavron* issue.

We find no error in the family court's calculation of the marital standard of living. The court's finding that Robin needed $70,000 to $75,000 of income to maintain the marital standard is supported by the record.

Next, Keith's accusation of gender bias is baseless. His argument appears to arise from a gross misinterpretation of the record.

3

Finally, we find no error in the family court's calculation of child support. The court reasonably calculated Keith's available income for support given the evidence. Further, while Keith correctly notes that child support is based on a child's needs, his argument fails to consider that those needs are measured by the supporting parent's ability to pay. Keith does not deny that he can pay the ordered child support.

For these reasons, we affirm the family court's order.

FACTS AND PROCEDURAL HISTORY

I.

THE JUDGMENT

Keith and Robin married in 1989 and separated in 2014. They had three children together. One child, Camryn, was born in 2003 and was still a minor when the parties separated. Both Keith and Robin are licensed attorneys. Keith ran his own law firm during their marriage. Robin worked as an attorney early in the marriage but stopped to care for their children while Keith focused on his career. After their separation, in 2016, Keith closed his law firm and became a 50 percent partner in the law firm Bentley & More, LLP (Bentley & More).

Keith filed a marriage dissolution petition in May 2015, and the court entered a status only judgment a few months later. On December 14, 2017, the parties entered into a handwritten stipulation that covered child custody, child support, and spousal support (the stipulation). The stipulation was then converted into a formal judgment that was entered on April 10, 2018 (defined above as the judgment).

The judgment granted the parties joint legal custody of Camryn, with Robin receiving primary physical custody. The amount of support to which the parties agreed was based on a forensic accountant's report dated

4

December 12, 2017 (the 2017 income report), which concluded Keith had between $78,994 to $83,632 of available income for support. The parties determined child and spousal support amounts based on the 2017 income report.

The parties agreed Keith would pay Robin $5,000 in monthly child support until Camryn turned 18 years old and graduated high school or another condition occurred. The child support clause was typewritten and followed by a handwritten provision stating, "This was a compromise based upon the [2017 income report] as developed from both parties' representations [and] documents produced" (the compromise clause; capitalization omitted.)

As to spousal support, Keith agreed to pay Robin $19,000 per month until either party died, Robin remarried, or upon further court order. This typewritten portion of the judgment was also followed by the handwritten compromise clause.

The judgment had no findings as to the parties' marital standard of living. Instead, it specified, "[t]his Judgment does not provide for a finding relative to the standard of living. However, neither party shall be prejudiced or benefited by the lack of such a finding. The Court shall reserve jurisdiction to make a finding as to the marital standard of living, upon the request of either party, at any later hearing."

A section in the judgment titled, "Gavron Notice" stated, "Notwithstanding the amount and term of spousal support awarded herein, and regardless of the length of the marriage, it is the goal of the State of California that [Robin] shall become self-supporting within a reasonable period of time. The failure to make reasonable, good faith efforts to become

5

self-supporting may be one of the factors considered by the Court as a basis for modifying or terminating support."

Under the judgment, Robin received the parties' home in Newport Beach, which was valued at $2.8 million and had a $350,000 encumbrance. Keith received a rental property in Newport Beach worth $1.8 million with no encumbrance. In total, each party received nearly $5.2 million in real and personal property.

## II.

### THE MODIFICATION REQUEST

Robin filed the modification request on June 11, 2020, requesting increases to spousal and child support.  Camryn was 17 years old at the time.

In her filing, Robin alleged "[t]here ha[d] been a material change of circumstances since . . ." entry of the judgment. The modification request included Robin's declaration, which elaborated on the change in circumstances. She averred that the parties agreed on $19,000 in spousal support based on the 2017 income report's analysis of Keith's available income. But "the $19,000 monthly support figure was by no means a representation of and/or close to our marital standard of living." Rather, it was a compromise "based on KEITH's claims regarding the reduction in his earnings from closing down one [law] practice to open another."

Robin's declaration further explained that after a hearing in December 2015,[3] the court ordered Keith "to pay guideline child support on a step up schedule of $8,564 per month to $9,193 per month to $8,886 [*sic*] per

_____

[3] Robin's declaration states this hearing occurred in December 2017, but based on the other evidence in the record and the timeline of events she describes, it appears she meant December 2015.

6

month, and guideline spousal support on a step up schedule of $25,350 per month to $42,074 per month." In September 2016, the parties agreed to modify these support orders to allow Keith to pay $7,000 per month in child support and $30,000 in spousal support. Robin declared she agreed to reduce monthly child and spousal support in the stipulation to $5,000 and $19,000, respectively, based on Keith's "claims at the time that he was closing his law practice and starting a new practice," which had reduced his income and ability to pay support. Robin claimed the compromise clause was a reference to this agreement to reduce support. She asked the court to determine the parties' marital standard of living and award her "an amount of support that is comparable with [the parties'] pre-separation lifestyle."

The modification request also included an income and expense declaration. Robin claimed a total average monthly income of $21,797, comprised of $19,000 in spousal support, $80 in dividends/interest, and $2,717 in annuity payments. In contrast, she listed $33,123 in average monthly expenses. The modification request further explained that while Robin was a licensed attorney, she had not worked in over 25 years other than occasional "administrative duties" at Keith's law firm.

After filing the modification request, Robin submitted several more income and expense declarations. In September 2020, she claimed actual and proposed monthly expenses of $130,108. In August 2021, she claimed $53,469 in average monthly expenses but stated her proposed needs were $108,505. In February 2023, she claimed $104,939 in proposed and actual expenses.

Keith objected to the modification request. He maintained the 2017 income report determined he should be paying $6,000 in child support and $18,000 in spousal support for a total support obligation of $24,000 per

7

month. He claimed the compromise clause referred to the parties' agreement to reallocate this total support obligation to $19,000 in spousal support and $5,000 in child support. Keith also argued that Robin had not complied with the judgment's *Gavron* warning and had not looked for work or tried to become self-supporting.

After Keith filed his objection, Robin agreed to submit to a vocational examination with David Lane of REGAIN, Inc. After Lane submitted his report, Keith filed a supplemental response in August 2021. He claimed his law firm's finances had been hurt by the COVID-19 pandemic, which had significantly decreased his income. Given his decreased income and Lane's opinion of Robin's job prospects, he requested the family court reduce her spousal support to $6,717 per month. He also noted that Camryn was no longer a minor, as she had turned 18 a few months prior.[4]

### III.

### THE HEARING

The hearing on the modification request began in November 2021, but it was continued several times and did not conclude until June 2023. We discuss the relevant evidence below.

---

[4] We note that prior to the hearing on the modification request, Robin filed a brief claiming Keith had breached his fiduciary duties by failing to disclose $5.6 million in distributions he had received from Bentley & More. These distributions were allegedly made between December 18, 2017 and January 18, 2018, after the signing of the stipulation on December 14, 2017, but prior to the entry of the judgment on April 10, 2018. In response, Keith did not deny receiving this $5.6 million. Rather, he argued no breach of fiduciary duty had occurred because the parties' signing of the stipulation had resolved all support issues.

8

*A. The Accountant's Report and Testimony*

In April 2022, the parties stipulated that forensic accountant Andrew Hunt would determine each party's available income for support and the marital standard of living. They agreed to a cutoff date of December 31, 2021 for the income analysis.

Hunt prepared a report and testified at the hearing. He calculated the parties' marital standard of living based on their combined income less housing expenses over the last five years of their marriage, i.e., from 2010 through 2014. He then performed four different calculations of the after-tax sum Robin needed to maintain the marital standard of living. The four calculations were based on two different variables. The first variable was inflation using the Consumer Price Index (CPI). Hunt made one calculation with a CPI adjustment and another with none. The second variable involved weighting the five years of income. He performed one calculation using a simple average of the five years and another giving more weight to the years closer to the parties' separation. Hunt explained the latter approach could be appropriate to give weight to the "'upward mobility' of the family."

Hunt prepared a chart summarizing these four calculations. It shows the amount of *after-tax* income Robin needed to maintain the marital standard of living:

|  | CPI Adjustment | No CPI Adjustment | Average |
|---|---|---|---|
| Weighting of Years | $ 56,500 | $ 44,200 | $ 50,350 |
| Simple Average of Years | $ 51,200 | $ 39,900 | $ 45,550 |
|  | $ 53,850 | $ 42,050 | $ 47,950 |

The highest calculation, $56,500 per month, included a CPI adjustment and a weighted income average. The next highest amount, $51,200 used a simple income average and a CPI adjustment. The second to lowest amount, $44,200, used a weighted income average and no CPI adjustment. The lowest amount, $39,900, used a simple income average and no CPI adjustment.

Hunt also calculated different averages of the above sums, which are shown on the chart at the bottom of each column and the end of each row. The average of all four sums was $47,950, which is reflected in the bottom right corner of the chart. Hunt rounded this amount up to $48,000 per month and opined this rounded sum best reflected the *after-tax* sum Robin would need to maintain the marital standard of living "consider[ing] . . . all of the issues contributing to the [marital standard of living]." (Boldface omitted.) Hunt estimated Robin would need monthly *pretax* payments of $70,000 to $75,000 to result in an after-tax sum of $48,000.

Hunt also calculated Keith's average monthly income available for support from 2017 to 2021:

| Year | Monthly Available Income |
|------|--------------------------|
| 2017 | $81,663 |
| 2018 | $866,488 |
| 2019 | $328,074 |
| 2020 | • $444,208 for the entire year<br>• $939,444 for the first five months<br>• $90,469 for the final seven months |
| 2021 | $149,190 |

For 2020, Hunt made three separate income calculations. He calculated an average income of $444,208 for the entire year. Hunt also calculated separate average incomes for the first five months and the last seven months of 2020, so the court could see Keith's average monthly income in the months before and after the modification request, which was filed on June 11, 2020. This calculation also showed the COVID-19 pandemic's effect on Keith's monthly income: He averaged $939,444 during the first five months of 2020 compared to $90,469 over the final seven months.[5]

Based on Keith's income from 2017 through 2021, Hunt calculated Keith had an average of $373,925 in monthly income available for support.

As to child support, Robin was only eligible for retroactive support for the period between June 11, 2020, when she filed the modification request, through June 15, 2021, when Camryn graduated from high school. Hunt calculated child support for 2020 and 2021 separately using DissoMaster.[6]

For 2020, Hunt ran two child support calculations. One used Keith's average income for the final seven months of 2020 ($90,469). The other used his average income for the entire year ($444,208). Using the former sum, he calculated Keith's child support obligation to be either $6,211

[5] Government orders requiring Californians to stay home due to the COVID-19 pandemic were issued in the middle of March 2020. (*People v. Breceda* (2022) 76 Cal.App.5th 71, 81.) Jury trials were also suspended at this time. (*People v. Superior Court* (*Tapia*) (2023) 93 Cal.App.5th 394, 398–399.)

[6] "The DissoMaster is one of two privately developed computer programs used to calculate guideline child support as required by section 4055, which involves, literally, an algebraic formula." (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 523–524, fn. 2.)

or $6,278 per month from June to December of 2020, depending on whether Robin's potential earnings were considered. Crediting Keith with the $5,000 per month he paid under the judgment, this resulted in *total* retroactive child support of $8,477 or $8,946 for 2020.

However, using Keith's average income for all of 2020 ($444,208) resulted in retroactive child support of $27,202 or $27,237 per month from June to December of 2020 (again depending on whether Robin's earning potential was included). After crediting Keith with the $5,000 he had paid each month, this amounted to $155,414 or $155,659 in *total* retroactive child support for 2020.

For 2021, Hunt only ran one child support calculation. While the child support request just covered the first six months of the year, Hunt only calculated Keith's average monthly income for the entire year. Unlike with 2020, he did not separately calculate Keith's average income for the six-month period for which child support was potentially owed. Hunt calculated a potential child support obligation of $9,840 or $9,891 per month for January through June 2021, depending on whether Robin's potential income was included. After crediting Keith $5,000 per month, this totaled $24,200 or $24,455 in retroactive support for 2021.

B.  *Robin's Testimony*

Robin testified that during the parties' marriage they traveled to places like Mammoth, Cabo, Fiji, Rome, Paris, Aspen, Florida, Arizona, Idaho, New York and Chicago. Their family also traveled to Mexico every Christmas. They owned two homes at separation and owned more than two homes at various times. They saved a lot of money, which was put into savings accounts or used to purchase annuities. Robin was able to buy clothes whenever she wanted and had a personal fitness trainer.

12

With her current level of support, Robin claimed she was unable to buy clothes to the same extent as during her marriage. She no longer had a personal trainer because she could not afford it. Robin testified that she had drained her savings account over the last few years to "maintain [her] style of living" during the marriage. She had used about $150,000 in savings per year.

The judgment mandated that each party was required to pay half of Camryn's college expenses, including "tuition, room and board, books, fees, labs, transportation, clothing, reasonable allowance, and other reasonable expenses." Robin stated she had gone into debt to pay her half of these expenses. She also had an "extreme amount of deferred maintenance on [her] home . . . [and] on [her] vehicle."

If awarded retroactive spousal support, Robin stated she would like to reduce her debt, replenish her savings, and pay for the maintenance on her house and car. If those goals were accomplished, she "would love to travel."

As to her work history, Robin testified she started working as an associate attorney at Murtaugh Miller Meyer & Nelson in 1990. After discussions with Keith, she left this job after about six years to raise their children. She then worked at Keith's law practice sporadically. She did some legal work, such as defending a few depositions and consulting with Keith on cases, but performed no trial work. She also did nonlegal work, like decorating the office for the holidays, buying and wrapping Christmas presents for employees, and planning office trips. She did not go into the office regularly and did most of her work from home. She kept this role until the parties' separation in 2014.

Robin stated she had recently obtained a job working around 30 hours per week as the general manager of a tennis and pickleball club in Newport Beach. She earned about $3,600 to $3,900 per month. She did not want to work as an attorney due to the stress of the job, but she was still licensed.

## C. *Lane's Testimony*

Lane, the vocational examiner, opined that Robin was "significantly underemployed." He believed she could reestablish her career as an attorney and find work paying between $7,917 and $11,583 per month or $95,000 to $139,000 per year. Alternatively, if she sought a lower-level position like a legal assistant, she could earn between $3,770 and $5,373 per month or $45,240 to $64,480 annually.

## IV.

### THE RULING

The court provided an oral tentative ruling on June 14, 2023, which was followed by a written minute order. After Keith requested a statement of decision, Robin drafted several proposed statements, to which Keith objected. The court filed the final statement of decision in January 2024 (the statement of decision) and stated there would be no further orders.

In the statement of decision, the court recognized that spousal support could only be modified if there had been a substantial change of circumstances since the judgment. It found two such changes had occurred.

First, child support had terminated in June 2021. (Fam. Code, § 4326, subd. (a).)[7] Per statute, a spousal support modification request based

---

[7] All further undesignated statutory references are to the Family Code.

14

on the termination of child support must "be filed by either party no later than six months from the date the child support order terminates." (§ 4326, subd. (b).) Since Robin had filed the modification request in June 2020, a year before child support terminated, the court found it had been filed "no later than six months from the date the child support order terminate[d]." As such, it concluded spousal support could be modified on this ground.

Second, the court found Robin's "needs were never originally satisfied by the last [spousal support] award at the time it was made" and had "increased since the last award." Either of these facts, combined with Keith's increased income, constituted a material change in circumstances.

To determine the amount of spousal support to award Robin, the court conducted a new analysis of the factors in section 4320. The court adopted Hunt's finding that Robin's after-tax needs based on the marital standard of living were between $51,000 to $56,500 per month. It also found Keith's income at the time of the judgment was about $75,000 per month. Therefore, the court concluded "the original spousal support order of $19,000 per month was insufficient to maintain the marital standard of living when the [judgment] was made. . . . Keith did not have the financial resources to meet Robin's needs at the time of the Judgment."

The court also observed that "both parties['] income ha[d] substantially changed since the April 10th, 2018, Judgment." Based on Hunt's calculations, the court found Keith now had an average income of $373,925 per month, which was a significant increase since the judgment. It also noted that Robin's income was $2,374 a month at the time of the judgment but had increased to $9,486 per month from annuities.

Next, the court found Hunt's opinion persuasive that Robin required an *after-tax* sum of $48,000 per month to meet her needs. It then

15

adopted Hunt's finding that achieving this after-tax sum required a *pretax* payment between $70,000 to $75,000. Thus, considering Robin's annuity income, the court ordered Keith to pay her $62,000 in monthly spousal support from June 15, 2020 to June 30, 2023.

However, the court ruled that starting July 1, 2023, it would impute $10,000 of monthly income to Robin for failing to comply with the *Gavron* warning, which reduced her monthly spousal support to $52,000. In explaining the $10,000 reduction, the court noted that "setting spousal support at zero for the failure to comply [with] *Gavron* would not result in a just and equitable result and would be . . . an abuse of discretion." Based on these findings, the court ordered Keith to pay Robin $1,701,500 in retroactive spousal support.[8]

Next, the court addressed the retroactive child support owed from June 2020 to June 2021. It noted that for 2020, Hunt had calculated different average monthly incomes for Keith. For the period from June through December 2020, Keith averaged $90,469 per month. But his average monthly income based on the entire year was $444,208. For its 2020 child support calculation, the court used the full-year average of $444,208 per month since Hunt had only calculated Keith's average income for 2021 based on the full

---

[8] The court also gave great weight to certain section 4320 factors. For example, it greatly considered each party's current assets and obligations. It observed that the judgment split about $5 million in assets between the parties. Robin had current assets of $5,085,244 with $531,984 of total debt, while Keith had $16,025,000 in assets against $2,918,381.65 of debt. The court also noted "the length of the marriage weighed heavily among the Family Code section 4320 factors." It also gave great weight to the tax consequences to each party. Keith would be able to deduct spousal support, while Robin would have to pay taxes on it.

year. Thus, the child support calculations for 2020 and 2021 were both based on Keith's average monthly income over those entire years. Based on these sums, the court ordered guideline child support of $27,115 per month from June 15 to December 31, 2020, and $9,718 per month from January 1 to June 15, 2021. After subtracting the support Keith had already paid, the court ordered him to pay $172,055 in retroactive child support.

Keith appeals the family court's support orders. He makes five arguments. First, the court lacked authority to modify spousal support because there had been no changed circumstances since the judgment. Second, the court erred by increasing spousal support because Robin failed to comply with the *Gavron* warning and could become self-supporting if she worked as an attorney. Third, the court miscalculated the marital standard of living. Fourth, the court's spousal support order is rooted in gender bias. Fifth, the court's child support calculation is wrong. We find no error.

DISCUSSION

I.

STANDARD OF REVIEW

"The most fundamental principle of appellate review is that "'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it . . . and error must be affirmatively shown.'"" (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 125–126.)

We review orders modifying spousal and child support for an abuse of discretion. (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 398 [spousal support]; *Brothers v. Kern* (2007) 154 Cal.App.4th 126, 133 [child support].) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling

17

under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712, fns. omitted.)

## II.

### AUTHORITY TO MODIFY SPOUSAL SUPPORT

Keith argues the court lacked authority to modify spousal support because there had been no change in circumstances since the judgment. We disagree. The court could modify spousal support because Keith's income had increased significantly and the initial award of $19,000 per month was insufficient to meet Robin's needs when it was made.[9]

"To modify support obligations, a movant must prove circumstances have changed *since the last order*." (*In re Marriage of Furie* (2017) 16 Cal.App.5th 816, 832.) This is true "whether the original award arises from an evidentiary hearing or by stipulation." (*In re Marriage of Farrell* (1985) 171 Cal.App.3d 695, 701.) This rule exists to provide finality to dissolution cases. Without it, "unhappy former spouses could bring repeated actions for modification with no burden of showing a justification to change the order. Litigants "'are entitled to attempt, with some degree of certainty, to reorder their finances and life style [*sic*] in reliance upon the finality of the

---

[9] Keith argues the family "court lacked *jurisdiction* to modify spousal support." (Capitalization & boldface omitted; italics added.) While "the term 'jurisdiction' has 'many different meanings'" (*Quigley v. Garden Valley Fire Protection Dist.* (2019) 7 Cal.5th 798, 807), the cases we have reviewed do not discuss changed circumstances as a jurisdictional requirement for a court to modify spousal support. Thus, for clarity, we consider whether the court had authority to modify spousal support rather than whether it had jurisdiction.

decree.'" [Citations.] Absent a change of circumstances, a motion for modification is nothing more than an impermissible collateral attack on a prior final order." (*In re Marriage of Biderman* (1992) 5 Cal.App.4th 409, 412–413.)

Generally, "an increase in the supporting spouse's ability to pay does not *alone* constitute a material change of circumstances." (*In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 549.) However, it may be grounds for an increase if "the supported spouse's needs (1) have increased since the last award *or, if not*, (2) were not met under the prior award and continue to be unmet." (*Ibid*, italics added; *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 482–483.) A supported spouse may demonstrate the latter condition "by showing that the payor did not have the financial resources to meet those needs at the time of separation." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 364 (*Hoffmeister II*).)

A spouse's needs can be measured using the marital standard of living as "a threshold or reference point." (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 424.) "[I]f spousal support is still continuing, and if there is subsequently an increase in the supporting spouse's income sufficient to return both parties to the marital standard of living, support will be increased to an amount that will permit the supported spouse to live at that standard." (*In re Marriage of Smith, supra*, 225 Cal.App.3d at p. 482.)

There is no dispute Keith's income has significantly increased since the time of the stipulation and judgment. The family court also found that Robin's needs had not been met by the initial spousal support award of $19,000 and continued to be unmet. It explained, "Keith did not have the financial resources to meet Robin's needs at the time of the Judgment." These findings are supported by substantial evidence. (See *In re Marriage of*

*Catalano, supra*, 204 Cal.App.3d at pp. 549–550 [applying substantial evidence standard].)

To begin, there is ample evidence that the initial spousal support award of $19,000 per month was insufficient to meet Robin's needs. The court found the *after-tax* income Robin needed to maintain the marital standard of living was between $51,000 to $56,500 per month. This finding was supported by Hunt's report. Yet the judgment only awarded Robin $19,000 in *pretax* income, which was significantly below her needs.

Robin's testimony further corroborates that the initial spousal support order did not meet her needs. She testified that the parties traveled extensively during the marriage. She could buy clothes whenever she wanted and had a personal fitness trainer. The parties also saved a lot of money. However, Robin was unable to maintain this lifestyle on $19,000 of monthly support. She could not buy clothes to the same extent, she no longer had a personal trainer, she was not traveling as often (if at all), she had deferred maintenance on her car and home, and she had used about $150,000 in savings per year to meet expenses. Based on this evidence, the court reasonably concluded the initial support award of $19,000 was insufficient to meet Robin's needs when it was made.

Further, there is evidence supporting the court's finding that Keith's income around the time of the judgment, i.e., in 2017, was insufficient to provide enough spousal support to meet Robin's needs.[10] The chart below summarizes Keith's annual and monthly income available for support. It

---

[10] Though the judgment was entered in early 2018, the financial data upon which it was based came from the 2017 income report.

20

shows his available income from 2010 through 2014, the final five years of the parties' marriage, was significantly higher than in 2016 and 2017:

| Year | Annual | Monthly |
|------|--------|---------|
| 2010 | $1,188,554 | $99,046 |
| 2011 | $1,097,060 | $91,422 |
| 2012 | $1,906,713 | $158,893 |
| 2013 | $2,466,725 | $205,560 |
| 2014 | $2,029,769 | $169,147 |
|      |        |         |
| 2016 | $756,848 | $63,071 |
| 2017[11] | $864,852 | $78,623 |

Notably, Keith had over a million dollars in available annual income from 2010 through 2014. His lowest monthly average during this period was $91,422 of available income, which occurred in 2011. During the last three years of the parties' marriage, he averaged between $158,893 to $205,560 per month in available income.

Keith's income greatly decreased in 2016 and 2017, around the time he was closing his law firm and starting Bentley & More. In 2017, the year the stipulation was signed, Keith's available income was much lower than his income during the last five years of the parties' marriage. His average available income per month was $12,799 less than 2011, about a 14 percent decrease. It was also $126,937 a month less than his 2013 income, about a 62 percent decrease. The court could reasonably find Keith did not

---

[11] Keith's 2017 income was calculated as of November 30, 2017.

have the financial resources to meet Robin's needs at the time of the judgment based on this evidence. As such, the initial spousal support award of $19,000 did not meet Robin's needs when it was made. (*Hoffmeister II*, *supra*, 191 Cal.App.3d at p. 364.)

Given Keith's increased income and the failure of the initial support order to meet Robin's needs, the court could modify spousal support to an amount that would permit Robin to live at the marital standard. (See *In re Marriage of Smith*, *supra*, 225 Cal.App.3d at p. 482; *In re Marriage of Catalano*, *supra*, 204 Cal.App.3d at p. 549.)

Citing *Hoffmeister II*, *supra*, 191 Cal.App.3d at pages 360–361, 364, Keith contends the modification request must be denied because Robin's needs were not defined in the stipulation or judgment. *Hoffmeister II* does not support this contention. In *Hoffmeister II*, the court refused to imply a finding that the prior spousal support order was insufficient, when made, to meet the supported party's needs because there was no evidence to support such a finding. (*Id.* at pp. 360–361, 363–364.) Here, in contrast, there is substantial evidence supporting the family court's finding that Robin's needs were not met by the initial spousal support order. (See, e.g., *In re Marriage of Catalano*, *supra*, 204 Cal.App.3d pp. 550–551 [though the prior child support order did not define the child's needs, the court found it was insufficient based on the supported spouse's testimony].)

Keith also asserts that the judgment did not include any findings on the section 4320 factors underlying the initial spousal support award of $19,000. He claims that without any evidence of the factors underlying this award, a change of circumstances cannot be shown. But he cites no authority for this argument. Regardless, even if this assertion were legally correct, which we need not determine, there is sufficient evidence that the parties

agreed to $19,000 in spousal support due to Keith's decreased income in 2016 and 2017. As discussed above, his income at that time was insufficient to meet Robin's needs based on the marital standard of living.

Similarly, Keith argues the parties are bound by the stipulation and judgment. He contends that once a stipulated support order is final, "it cannot be challenged by request for modification, since an alleged failure to consider then-existing circumstances (like marital standard or a party's earnings) is not tantamount to an allegation of change." But the modification was not based on circumstances that existed at the time of the judgment. Keith's income increased from $78,623 per month at the time of the judgment to $373,925 per month at the time of the modification request hearing. Because the initial spousal support order of $19,000 was insufficient to meet Robin's needs, Keith's increased income allowed the court to modify the spousal support order. (*In re Marriage of Catalano, supra,* 204 Cal.App.3d at p. 549; *In re Marriage of Smith, supra,* 225 Cal.App.3d at p. 482.)

Finally, we are unpersuaded by Keith's analogy to *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467. It did not involve the situation we face here, where the prior spousal support order did not meet the supported spouse's needs and the supporting spouse's income increased after the order. Rather, in *In re Marriage of Khera & Sameer*, the parties agreed to a stipulated judgment that would pay the wife spousal support for three years before terminating. (*Id.* at p. 1471.) The termination date was based on the parties' expectation that the wife would finish her master's degree in social work by that time and become self-supporting. (*Id.* at p. 1478.) However, the wife enrolled in a doctoral program in psychology and had not finished her degree when spousal support terminated. (*Id.* at pp. 1473, 1481.) The relevant issue was whether the wife's inability to become

23

self-supporting was an unrealized expectation that would constitute a change in circumstance. (*Id*. at pp. 1480–1481.) The court's analysis of that issue is not germane here.

Since the family court had authority to modify spousal support for the reasons above, we need not address its findings that (1) Robin's needs had increased since the judgment, or (2) it could modify spousal support based on the termination of child support.

## III.

### THE SPOUSAL SUPPORT INCREASE

#### A. *The* Gavron *Warning*

Keith claims the family court abused its discretion by increasing Robin's spousal support given her failure to comply with the *Gavron* warning. We find the court's actions were reasonable.

The family court has broad discretion when modifying a spousal support order. (*In re Marriage of Shimkus* (2016) 244 Cal.App.4th 1262, 1273.) "In exercising that discretion, the court must consider the required factors set out in section 4320. [Citation.] The court has discretion as to the weight it gives to each factor [citation], and then "'the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of [its] discretion." [Citation.]' [Citation.] Failure to weigh the factors is an abuse of discretion." (*Ibid*.)

In weighing the section 4320 factors, courts must consider "[t]he goal that the supported party shall be self-supporting within a reasonable period of time." (§ 4320, subd. (*l*).) The family court considered this factor. It reduced Robin's monthly spousal support by $10,000 (from $62,000 to $52,000) due to her failure to comply with the *Gavron* warning. Keith does not clearly identify the alleged error in this ruling. Rather, he broadly

contends that increasing spousal support from $19,000 to $52,000 per month "'exceed[s] the bounds of reason'" and that there are no cases in which "failure to heed a *Gavron* warning leads to an enormous increase in spousal support." Thus, he concludes "that no judge would make the same order under the same circumstances."

We disagree. Lane testified Robin could earn a salary of up to $11,583 per month if she resumed her legal career. However, she needed $70,000 to $75,000 in monthly pretax income to maintain the marital standard of living. As such, even if Robin resumed practicing law, her monthly salary of $11,583 and her annuity income of $9,486 would still leave her at least $48,931 per month short of meeting the marital standard of living.[12]

The family court addressed the disparity between Robin's earning potential and the marital standard of living. It explained, "setting spousal support at zero for the failure to comply with *Gavron* would not result in a just and equitable result and . . . would be an abuse of discretion." So, instead

---

[12] Keith repeatedly argues that the $62,000 of spousal support awarded by court was grossly disproportionate to the $33,123 in expenses that Robin initially claimed when she filed her modification request. However, the court found she needed $70,000 to $75,000 in monthly pretax payments to meet her needs. This is the relevant sum when analyzing the support award. The initial amount of expenses Robin claimed in her modification request is immaterial to our analysis. Keith also appears to suggest that Robin could have been as financially successful as him if she had returned to practicing law. But nothing in the record supports this point. As set forth above, she only spent a few years working as a lawyer during the beginning of the marriage. While she worked at Keith's law office during the marriage, the evidence indicates many of her tasks were administrative. More importantly, Lane testified she could make *up to* $11,583 per month if she resumed her legal career. There was no contrary evidence in the record.

of terminating spousal support, the court imputed $10,000 of potential earnings to Robin, reducing her spousal support award to $52,000 per month starting July 1, 2023. This $10,000 reduction appears to be based on Lane's testimony. Due to the gulf between Robin's potential earnings and her needs, this result was not "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 [describing abuse of discretion standard].) This is especially true given the length of the parties' marriage.

Further, keeping Robin's spousal support at $19,000 per month would be inequitable for the same reasons. Adding $19,000 in support to her annuity income and potential monthly salary of $11,583 would result in $40,069 in monthly income. This would still leave Robin at least $29,931 per month short of the $70,000 to $75,000 needed to maintain the marital standard of living. "[I]t would be an abuse of discretion to order support which leaves the supported spouse at a standard of living significantly lower than that enjoyed during marriage while allowing the supporting spouse a significantly higher one." (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 568; *In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 30 ["It is inequitable after a long marriage to supply the husband with a continued standard of living much higher than the wife's"].)

B. *Robin's Ability to Support Herself*

Keith appears to argue that the court abused its discretion by increasing spousal support because Robin could become self-supporting if she found work as an attorney. We find no error. As discussed above, Robin's income would be far below the marital standard of living even if she returned to legal practice.

26

Similarly, Keith suggests that Robin could meet her reasonable expenses if she worked as an attorney. But this is not the applicable legal standard. Under section 4320, there are numerous factors courts must consider in setting spousal support: the needs of the parties based on the marital standard of living, the ability of the supporting spouse to pay, the marriage's length, the hardships to each party, the parties' tax consequences, each party's assets and obligations, and the goal for parties to become self-supporting, among other factors. (§ 4320.) The court considered all these factors when modifying spousal support, and we find no error in its application for the reasons above.

We are unpersuaded by Keith's citation to *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375. Indeed, Keith's own description of this case shows its inapplicability. He states, "In *Moseley* [*sic*], a vocational examination report reported the wife should be able to earn at least $78,000 per year if she worked only six hours a day, and substantially more if she worked full time. The husband asked the court to impute income to the wife, and *the court denied that relief.* [Citation.] [¶] Our District Court of Appeal . . . reversed . . . ." (Italics added.) Here, the family court imputed $10,000 of monthly income to Robin, which was a reasonable amount based on Lane's vocational report.

## IV.

### THE MARITAL STANDARD OF LIVING

Next, Keith claims the family court miscalculated the marital standard of living. We are unpersuaded.

First, Keith appears to suggest the marital standard of living cannot be calculated using the parties' income. He believes it should be calculated based on the parties' lifestyle as measured by their expenditures.

27

But he cites no authority holding the marital standard of living cannot be based on income. Rather, courts have stated the opposite: "[A] court may properly consider both income and expenses in determining the marital standard of living [citation], it may also base it on the family's average income, rather than expenses." (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 208.)

Next, Keith argues the court erred by adopting Hunt's calculation that Robin needed $48,000 in post-tax income to maintain the marital standard of living. He maintains the court should have used the calculation with no weighting and no CPI adjustment, which would have resulted in a standard of living of $39,000 per month.

As to the CPI adjustment, Keith claims "a cost-of-living adjustment has never been held a proper basis to modify support." This is inaccurate. "Support may . . . be increased upon a showing of . . . (1) an increase in the supporting spouse's ability to pay, *and* (2) an increase in the supported spouse's post-separation needs (e.g., *because of inflation*) in order to maintain" the marital standard of living. (*In re Marriage of Smith*, *supra*, 225 Cal.App.3d at p. 495, second italics added; *In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1172, fn. 7 (*Hoffmeister I*) [["T]here may also be situations in which the change in circumstances arises out of economic facts that may relate to both the need of one spouse and the ability to pay of the other—such as significant inflation of the currency"].)

As to Hunt's use of weighting, Keith contends this approach is inappropriate where the supporting spouse's income fluctuates. He argues a simple average should be used in such cases. We find no error. The family court could reasonably adopt the weighting approach to account for the parties' "*upward mobility*" near the end of their marriage, as Hunt

suggested. (See *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 48 [discussing the inequity of a simple average where there is upward mobility near the time of separation].) As Hunt noted, the parties' annual income from 2012 through 2014 was about twice as much as its income in 2010 and 2011. Keith has not cited any evidence showing the increased income from 2012 through 2014 was due to normal income fluctuations rather than upward mobility.

V.

GENDER BIAS

Keith also claims the family court's spousal support increase is the product of gender bias. This argument borders on frivolous and appears to arise from a gross misinterpretation of a single statement by the court.

In finding that Robin had not complied with the *Gavron* warning, the court commented, "Robin has not sought employment commensurate with her education and experience and is presently working part-time as a general manager of a pickle ball court. [¶] Were the shoe on the other foot, so to speak, and were [Keith] to say that he did not want to work anymore, he did not want to be a lawyer anymore, this court would view that with a joinder's eye. Support is important. The court also believes that to become self-supporting is also important." The parties agree the transcript should read "*jaundiced eye*'" rather than "*joinder's eye*." They also agree that this idiom "means to view something negatively."

Based on the above statement, Keith asserts that "[t]he trial judge recognized the same result would probably not obtain if Keith had decided he did not want to be a lawyer any more, and had moved for support from Robin. [Citation.] This preconception, that a wife is more entitled to

29

support than a husband, and has more right not to work to her capacity, impacts the validity of the result."

It is unclear how Keith arrived at this interpretation of the family court's statement. The court was stating the exact opposite: it would treat the parties the same if their roles were reversed. If Keith had decided to become the manager of a pickleball court instead of practicing law, the court would view that negatively and, presumably, find that he had failed to comply with the *Gavron* warning.

## VI.

### CHILD SUPPORT

The court ordered Keith to pay $172,055 in retroactive child support for the period from June 15, 2020 to June 15, 2021. Keith claims the family court erred in calculating the amount of retroactive child support he owes. He has shown no error.

To begin, Keith claims the family court miscalculated his average available income in 2020 for purposes of child support. As set forth above, Keith only owed retroactive child support for the last seven months of 2020. The court calculated his average monthly income available for child support based on all of his 2020 income, which resulted in an average of $444,208 per month. Keith asserts the court should have only averaged his income for the seven-month period for which he owed retroactive child support (June to December 2020). This would have led to an average monthly income of $90,469. The court's calculation resulted in retroactive child support of $27,115 per month for 2020, while Keith's suggested calculation would have resulted in $6,200 per month.

Keith generally cites *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, for the proposition that courts should use actual income,

30

when known, for retroactive support calculations "rather than income earned in prior years." Keith fails to cite a specific page for this assertion, and we do not find this case persuasive. *In re Marriage of Ciprari* held the lower court had abused its discretion by calculating retroactive support for *all of 2014* using 2013 tax returns when the 2014 tax returns were in evidence. (*Id.* at pp. 104–105.) Here, however, retroactive child support was owed for a portion of 2020: June to December. As we explain, the family court reasonably calculated support for this portion of 2020 using Keith's average monthly income for the entire year.

The court could reasonably infer that Keith's income from the first half of 2020 would be available for child support in the second half of the year. Hunt's report opined, "[t]he income earned and received prior to June 2020 would have been part of Keith's full year 2020 taxable income. Given the variable nature of income earned in Keith's practice, income in one period often funds the practice until further cases are resolved. . . . [I]t is not unusual for a practitioner in this field to rely upon income in prior periods to meet their business expenses in a full operating year." While Hunt was discussing Keith's business expenses, the same logic applies to his personal expenses. Keith's month-to-month income fluctuated. The family court could reasonably infer he used income from higher-earning months to pay expenses during lower-earning months. Given this inference, it made sense for the court to calculate 2020 support based on Keith's income for the entire year rather than his income over the seven-month period for which support was owed.

It was also rational for the court to calculate 2020 child support based on Keith's average monthly income for that entire year since the 2021 calculation was also based on his average monthly income for the entire year.

Robin was only eligible for retroactive child support in 2021 from January to June 15. Yet Hunt did not calculate Keith's average monthly income for this six-month period. He only calculated Keith's average monthly income for all of 2021. Thus, although retroactive child support for 2021 only covered a six-month period, the court had to base its support calculation on Keith's entire 2021 income. When determining retroactive child support for June to December 2020, the court reasonably decided to use Keith's average income for the entire year so that the 2020 support calculation matched the 2021 support calculation.

Keith likewise argues that his available "income for support should be calculated using a properly representative sample for the time periods at issue." (Citing *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1083–1084.) This is essentially the same argument as the one we just addressed, so we find no abuse of discretion for the same reasons.

Next, Keith cites *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 300, to argue that retroactive child support must be based on an independent assessment of the child's needs. He appears to suggest the court erred by measuring retroactive support using his income and expenses rather than assessing Camryn's needs.

The parties agree the court calculated child support based on the formula set forth in the Family Code. (See *In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1237.) This calculation is presumptively correct. (*Ibid.*) Keith's vague argument does not clearly identify how the court erred by applying this formula. Regardless, "'[w]hat constitutes reasonable needs for a child varies with the circumstances of the parties.'" (*S.P. v. F.G.* (2016) 4 Cal.App.5th 921, 931.) As *In re Marriage of Cheriton* explains, where the supporting parent is wealthy, "the trial court [is] required to analyze the

children's then-current needs, *as measured by the parents' ability to provide support.*" (*In re Marriage of Cheriton*, *supra*, 92 Cal.App.4th at p. 300, italics added.) "[T]he 'child's need is measured by the parents' current station in life.' [Citations.] 'Clearly where the child has a wealthy parent, that child is entitled to, and therefore "needs" something more than the bare necessities of life.'" (*Id.* at p. 293.)

Keith cites no evidence showing the child support award is beyond his ability to pay or that it is otherwise an "'unjust and unreasonable burden,'" as he suggests in his brief. As such, the court correctly used the statutory formula to calculate child support.

At oral argument for this appeal, Keith claimed the family court abused its discretion by relying solely on DissoMaster to calculate retroactive child support. He did not make this argument in his briefs, so we need not consider it. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219.)

Besides, we find no merit to Keith's argument. "[C]ourts are required to calculate child support under the statutory guidelines. [Citation.] '[A]dherence to the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes. [Citations.]' [Citation.] The guideline amount of child support, which is calculated by applying a mathematical formula to the parents' incomes, is presumptively correct." (*In re Marriage of Williams*, *supra*, 150 Cal.App.4th at p. 1237.)

The family court did not err by relying on DissoMaster because it is a recognized computer program that calculates guideline child support using the statutory formula. (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 524.) Its calculation is presumptively correct. (See *ibid*; *In re Marriage of Williams*, *supra*, 150 Cal.App.4th at p. 1237.) Nor has Keith identified any

exception warranting departure from guideline support. (*County of San Diego v. P.B.* (2020) 55 Cal.App.5th 1058, 1072 [The presumption that guideline child support is correct "may be rebutted by evidence showing application of the formula would be unjust or inappropriate due to special circumstances in the particular case"].)

DISPOSITION

The family court's order is affirmed. Robin is entitled to her costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


GOODING, J.


BANCROFT, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.